# District Court of the Navajo Nation

## Judicial District of Shiprock, New Mexico

**Kee Tom Farley, et al., Plaintiffs,**

**v.**

**Kerr McGee, et al., Defendants.**

**Decided June 6, 1996**

## ORDER

Judge Lorene Ferguson presiding.

THIS MATTER came for consideration of the Defendants' Motion to Dismiss filed on June 05, 1995, which was heard on October 18, 1995. Defendants moved this Court to dismiss this action for lack of subject matter jurisdiction and failure to state a claim upon which this Court may grant relief. As grounds for dismissal, Defendants assert that maintenance of this action in this forum violates express requirements of a comprehensive federal law, the Price-Anderson Act, 42 U.S.C. Section 2011 *et seq.*

Plaintiffs filed said complaint on January 12, 1995, seeking damages for wrongful death and injury allegedly resulting from exposure to vanadium and uranium processed at a uranium mill operated by Defendants in Shiprock, New Mexico. On April 26, 1995, Defendants filed a complaint for Preliminary Injunction and Declaratory Judgment in the United States District Court for the District of New Mexico (CIV 95-0438-MV). Defendants requested the United States District Court to permanently enjoin Navajo Tribal Court proceedings and declare that the Navajo Tribal Court is without jurisdiction to hear and adjudicate any claims asserted against them in tribal court. Defendants argued that this case constitutes a "public liability" action that is, "any legal liability arising out of or resulting from a nuclear incident" and, therefore, the Price Anderson Act applies to this case. Defendants further asserted that this Tribal Court does not have jurisdiction to resolve nuclear torts because the Price Anderson Act created a federal cause of action to resolve such disputes.

On June 8, 1995, U.S. District Judge Martha Vasquez, in a Memorandum Opinion And Order, ruled that, in accordance with the tribal abstention doctrine, the U.S. District Court was required to abstain from further action in this matter until the Tribal Court had ruled on the question of jurisdiction. Defendants then filed a Motion to Dismiss in this Court that was heard on October 18, 1995.

Defendants are foreign corporations that operated a uranium processing mill in Shiprock, New Mexico from 1952 to 1973. The mill was located on tribal trust land within the territorial jurisdiction of the Navajo Nation. Plaintiffs are members of the Navajo Tribe who either worked at the uranium processing site and/or resided within the immediate area of the processing mill. Plaintiffs allege that the

deceased, Lucy Farley and Julia Kady, died from exposure to vanadium and uranium processes and various radioactive substances and heavy metals. Plaintiffs are seeking damages for negligence and wrongful death and other tort damages stemming from the alleged operation of the processing mill.

As grounds for dismissal, Defendants assert that this Court cannot assert jurisdiction over nuclear torts allegedly committed by Defendants because the federal government has preempted the entire field of nuclear safety through Congressional enactment of the Price Anderson Act. Defendants contend that the Price Anderson Act expressly ceded limited power to the states and that no express delegation was granted to tribal courts and that none can be implied.

Secondly, Defendants argue that Congress created an exclusive method for resolving nuclear tort claims. To wit: the Price Anderson Act requires the filing of any suit involving injury from exposure to nuclear materials to be filed in federal court or in state courts with absolute and unqualified right of removal to federal court. Defendants further allege no express delegation was granted to tribal courts and none can be implied. Finally, the Defendants argue that comity requires the tribal courts to defer to federal courts.

The arguments Defendants pose are fundamentally flawed because they fail to reconcile their theories with Indian sovereignty principles as established by Federal Indian policy and United States Supreme Court decisions. To determine whether this Court has subject matter jurisdiction, this Court is obligated to carefully examine the Price Anderson Act in light of inherent tribal sovereignty, relevant statutes, case law, and federal policy.

## INHERENT TRIBAL SOVEREIGNTY

The history of tribal self-government forms the present right of tribes to govern their members and territories. Although extensive preexisting tribal sovereignty has been limited by tribal inclusion with the United States, trribal powers of self government are recognized by the U.S. Constitution, federal legislation, treaties, U.S Supreme Court decisions, and administrative practice. Such recognition is protected by the federal government to ensure continued viability of Indian self-government insofar as governing powers have not been limited or extinguished. Indian Tribes are sovereign in that they are political self-governing entities whose powers can be circumvented only by Congress. *U.S. v. Wheeler*, 435 U.S. 313, 323, 98 S. Ct. 1079, 1086, 55 L. Ed. 2d 303, 313 (1978). That is, a Tribe retains its sovereignty until Congress divests that sovereignty.

The most basic principle of Indian law is that those powers which are lawfully vested in an Indian Tribe are "inherent powers of a limited sovereignty which has never been extinguished." *Id.* at 322-323. Thus, Tribal powers are not delegated powers granted by express acts of Congress. Tribal powers that currently remain are those powers that tribes have always had and that remain within the domain of the tribe. In *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191 (1978),

the Supreme Court held that "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."

## TRIBAL CIVIL JURISDICTION OVER NONINDIANS

The Supreme Court, in *Montana v. United States*, 450 U.S. 544, S.Ct. 1245, 67 L. Ed. 2d 493 (1981), articulated the principle that underlies tribal court civil jurisdiction over non-Indians. The Crow Tribe of Montana, by a tribal regulation sought to prohibit hunting and fishing within its reservation by anyone who is not a member of the tribe. The tribal regulation applied to nonmembers of the tribe and that included lands within the reservation owned in fee simple by non-Indians. Meanwhile, Montana continued to assert its authority to regulate hunting and fishing by non-Indians within the Crow reservation. The United States, in its own right and as a fiduciary for the Tribe, filed an action seeking declaratory judgment quieting titles to the bank of the Big Horn River and to establish that the tribe and the United States have sole authority to regulate hunting and fishing within the reservation. They sought to force Montana to obtain tribal permission before issuing hunting and fishing licenses for use on the reservation.

The *Montana* Court addressed the sources and scope of the power of an Indian tribe to regulate hunting and fishing by non-Indians within its reservation owned in fee simple by non-Indians. In doing so, the *Montana* Court analyzed the scope of a tribe's power to exert civil jurisdiction over non-Indians within its reservation boundaries by stating unequivocally that "to be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Id.* at 565.

The *Montana* Court then announced that tribes may regulate the activities of non-members via taxation, licensing, or other means. A tribe may also exercise civil jurisdiction over non-members who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee land within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or health or welfare of the tribe. *Id.* at 565.

## NAVAJO TRIBAL AUTHORITY

The Navajo Nation is a sovereign and self-governing nation that predates the coming of the Europeans and the United States Constitution. The United States government recognized the Navajo Nation's sovereign status when it entered into two treaties with the Navajo Nation in 1850 (9 Stat. 974) and 1868 (15 Stat. 667). Treatymaking between Indian tribes and Europeans and later the United States government represented an agreement between two sovereign independent nations. F. Cohen, *Handbook Of Federal Indian Law* 232 (1982). The Court of

Appeals of the Navajo Nation (now the Supreme Court) pronounced this principle as follows: "When sovereign Indian nations dealt with the United States by treaty, they did so in an international law sense. Further, they (tribes) did not receive their lands and power from the United States but only ceded lands and privileges to it." *Benally v. John*, 4 Nav. R. 39 (Nav. Ct. App. 1983).

Although the Navajo Nation exercised self-government long before the arrival of Europeans, the Tribal Council was not formally established until 1926. The Navajo Tribal Council established the Navajo tribal courts and granted them authority to exercise civil jurisdiction over all actions that occur within its territorial jurisdiction. This authority to exercise jurisdiction is coextensive with that of the Navajo Nation as a sovereign. *Deal v. Blatchford*, 3 Nav. R. 159 (Nav. Ct. App. 1982).

The Navajo Nation's declaration of civil jurisdiction is found at Title 7 of the Navajo Tribal Code, section 253(2) (1985), which provides: "The District Courts of the Navajo Nation shall have original jurisdiction over ... all civil actions in which the Defendant is a resident of Navajo Indian Country or has caused an action to occur within the territorial jurisdiction of the Navajo Nation. Territorial jurisdiction of the Navajo Nation shall extend to Navajo Indian Country, which is defined as all lands within the exterior boundaries of the Navajo Indian Reservation or of the Eastern Navajo Agency, all land within the limits of dependant Navajo Indian communities, all Navajo Indian allotments, and all other land held in trust for, owned in fee by, or leased by the United States to the Navajo Tribe or any band of Navajo Indians." 7 N.T.C., Sec. 254.

Thus, the Navajo Tribal Code grants tribal courts jurisdiction over civil cases involving non-Indians if the defendant has caused an action to occur within the territorial jurisdiction of the Navajo Nation. It is undisputed that Defendants obtained a license to operate a uranium mill in Shiprock, New Mexico from 1952 through 1973. It is also an undisputed fact that Shiprock is located within the territorial jurisdiction of the Navajo Nation. Plaintiffs alleged that Defendants' uranium mill operation resulted in sickness and death; therefore, the authority to exercise jurisdiction by this Court is satisfied in accordance with 7 N.T.C., Sections 253, 254

Moreover, the Navajo Nation has the "power to exercise civil authority over the conduct of non-Navajos where the conduct threatens or has some direct effect on the political integrity" of the Navajo Nation. *U.S. v. Montana*, 450 U.S. at 565. The conduct Defendants allegedly committed has a direct effect on the political integrity of the Navajo Nation. Political integrity is dependant on the respect, honesty and faith the Navajo people entrust in the Navajo government to protect their rights in accordance with Navajo common law. A basic Navajo common law is that one who is found responsible for inflicting harm on another person must pay the victim for the harm to restore harmony. If the Navajo tribal courts cannot provide a forum to address allegations of tortious conduct and provide remedies where appropriate, the political integrity the tribal government is seriously compromised.

Furthermore, tribal courts have civil jurisdiction over non-Indians who enter consensual relationships with the tribe or its members if the cause of action arises on the reservation. *Id.* Defendants admitted that they entered into a lease with the Navajo Nation to operate the uranium mill. Defendants freely decided to enter a consensual agreement with the Navajo Nation to operate the mill in Shiprock. Any business deals, contracts, or leases made with the Navajo Nation that are designed to operate on the Navajo Nation subject those businesses to Navajo tribal jurisdiction. *Arizona Public Service Co. v. Office of Navajo Labor Relations,* 6 Nav. R. 246 (1990).

In conclusion, Navajo Nation courts have the authority and power to exercise jurisdiction over non-Indians where a claimant alleges that a non-Indian committed a tortious act within the exterior boundaries of the Navajo Nation.

Any other conclusion would diminish the Navajo tribal courts' ability to play an important and essential role in tribal self-government, contrary to Congressional policy of supporting Indian self-government and self determination, by recognizing that tribal courts constitute an integral part of tribal sovereignty. In *National Farmers Union Insurance Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 105 S. Ct. 2447, 85 L.Ed. 2d 818 (1985), the Supreme Court articulated the policy of encouraging development of tribal courts by making them the primary focus for adjudication where tribal jurisdiction is being challenged so that they have the first opportunity to evaluate the actual and legal basis for the challenge. *Id.* at 856-857. The Supreme Court in *Iowa Mutual Insurance Co. v. La Plante,* 480 U.S. 9, 107 S. Ct. 971, 94 L. Ed. 2d 10 (1987), reaffirmed that Indian tribal courts have a role in tribal sovereignty and self government. And unlike criminal jurisdiction, tribal civil jurisdiction over activities of non-Indians on reservation trust land presumptively lies in tribal courts unless affirmatively limited by specific treaty provisions or federal statutes.

## APPLICABILITY OF GENERAL JURISDICTIONAL STATUTES

To determine whether Plaintiffs' claims are preempted by a comprehensive federal law, the Price Anderson Act, so as to preclude this Court from exercising jurisdiction, the Court needs to examine "legislative history of the federal statute at issue and language expressed on the face of the statute to determine whether Congress has divested tribal courts of jurisdiction." *Pela v. Peabody Coal Company,* 6 Nav. R. 238 (1990). It is essential for this court to examine the Price Anderson Act to discern how it affects the sovereignty of the Navajo Nation with the preservation of tradition and culture in mind.

Federal general jurisdictional statutes do not apply to tribes absent specific language which includes the tribes. In *Becenti v. Vigil,* 902 F.2d 777 (10th Cir. 1990), petitioner, at the outset, filed a petition against employees of the Bureau of Indian Affairs. Defendants were successful in removing the case to the federal district

court which in turn, dismissed the complaint for lack of jurisdiction. Plaintiff appealed to the 10th Circuit Court of Appeals which held that removal was not authorized by 28 U.S.C Sec. 1442 (a)(1), the statute providing for removal from "state court" of actions against officers of the United States or agency thereof. The Court in *Becenti* stated that Section 1442(a)(1) is not limited to removal actions brought in "state" courts. The Court cited several cases that have interpreted the "state court" language in both sections 1441 and 1443(1) as not accompanying actions commenced in courts other than those of the fifty "states." Stated the Court, the 10th Circuit was very careful and did not want to expand the jurisdiction of federal courts beyond congressional mandate. *Id.* at 780.

In *Pela, supra,* the Navajo court addressed the issue of whether Congress, by granting concurrent state and federal jurisdiction over certain ERISA claims, divested tribal courts of jurisdiction to hear those claims. Pela had filed a petition in tribal court alleging four causes of action. One claim was that defendant violated 29 U.S.C Sections 1132(a)(1)(B) & 1140. Defendant filed a petition to remove the case to federal court on the grounds of federal question jurisdiction which was granted by the tribal court. Pela appealed to the Navajo Supreme Court. The Navajo Supreme Court held that 29 U.S.C. Sec. 1132(a)(1)(B), which did not mention Indian tribes, does not bar Indian tribal courts from hearing such claims. The Court reasoned that since Pela filed his suit pursuant to Sec. 1132(a)(1)(B), which provided for concurrent jurisdiction, petitioner was permitted to sue in a non-federal court that may, in turn, apply local law. In contrast, Congress desired uniformity in enforcement and regulation when it provided for exclusive jurisdiction regarding 29 U.S.C. Sec. 1132(e)(1) claims. Consequently, the state and tribal courts have no jurisdiction where a federal statute provides for exclusive jurisdiction.

The Price Anderson Act, similar to ERISA, does not mention Indian tribes. This Court is not willing to construe "state courts" contained in the Price Anderson Act to include Indian tribes. Thus, the Court will examine the Price-Anderson Act to determine whether it provides for state and federal concurrent jurisdiction. If it is found that it provides for exclusive jurisdiction, then tribal courts may be barred from exercising jurisdiction over this claim. On the other hand, if it is found that there is concurrent jurisdiction, then this Court will be persuaded that the Price Anderson Act does not bar this Court from exercising jurisdiction over this claim.

## THE PRICE ANDERSON ACT
## 42 U.S.C. SECTION 2011 *et seq.*

Defendants argue that Plaintiffs' claims are subject to the Price-Anderson Act because said action seeks to hold Defendants liable for injuries allegedly caused from exposure to vanadium, uranium and various radioactive substances and heavy metals resulting from the Shiprock Mill operations. Defendants assert that

this is a "public liability action" pursuant to the Price Anderson Act, 42 U.S.C. Sec. 2210(n)(2), which provides an exclusive remedy for such actions with an automatic right of removal if the claim was filed in state court.[1]

Defendants cited *In re TMI Litigation Cases Consolidated II*, 940 F.2d 832 (3rd Cir. 1991), to support its claim that 42 U.S.C. Sec. 2210(n)(2) is the exclusive remedy for "public liability" actions and that Congress created a federal cause of action for such claims when it amended the Act in 1988. According to the Third Circuit Court, under the terms of the 1988 Amendments Act, "public liability action" encompasses "any legal liability of any person who may be liable on account of a nuclear incident." *Id.* at 855. The Court further observed that given the breadth of this definition, if a plaintiff fails to state a public liability claim potentially compensable under the Price-Anderson Act, then plaintiff has no such claim at all. The *TMI* Court concluded that a claim growing out of any nuclear incident is compensable under the terms of the Amendment or it is not compensable at all and no state cause of action based on public liability exists after the 1988 amendments.

## DEVELOPMENT OF ATOMIC ENERGY

In 1946, Congress enacted the Atomic Energy Act of 1946, 60 Stat. 755, whereby the federal government monopolized the use, control and ownership of nuclear technology. The Atomic Energy Commission (hereinafter AEC) was given exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession and use of nuclear material. In 1954, the Atomic Energy Act was amended, 68 Stat. 919, to encourage private construction, ownership and operation of nuclear power plants for peaceful purposes,while exclusive jurisdiction to regulate and license nuclear safety was reserved to the AEC.

In 1957, Congress passed the Price-Anderson Act as an amendment to the Atomic Energy Act, Pub. L. 85-256, 71 Stat. 576, to assure adequate public compensation in case of a nuclear accident, and to limit the liability of private industry in order to encourage private participation in the development of nuclear energy. An indemnification scheme was established under which operators of licensed nuclear facilities could obtain up to $60 million in private financial protection against suits. The government would then provide indemnification for the next $500 million of liability, and the resulting $560 million would be the limit of liability for any one nuclear incident. The Act was amended again in 1959, "to clarify the responsibilities" of the states and the AEC with respect to the regulation of by-product, source, and special nuclear material. 42 U.S.C. Sec.

---

1. Public liability is defined as "any legal liability arising out of or resulting from a nuclear incident...." Sec. 2014(w). Nuclear incident is defined as "any occurrence, including an extraordinary nuclear occurrence, within the U.S. causing ... bodily injury, sickness, disease, death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material...." Sec. 2014(q). Byproduct material includes "tailings or waste produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content."

2021(a)(1). States were now allowed to regulate certain nuclear material in quantities not sufficient to form a critical mass. The AEC retained the exclusive jurisdiction over disposal of certain by-products, source, or special nuclear materials.

The 1966 Amendments to the Price-Anderson Act authorized the AEC to require defendants covered by the financial protection and indemnity to waive certain state-law defenses otherwise available. Said amendments responded to concerns raised regarding the adequacies of state law remedies in administering compensation for a victim of major nuclear incident. Congress required such waivers out of concern that state-law, such as the negligence standard of liability, were ill-suited to the problems of nuclear hazards. In 1974, the AEC was abolished and the regulatory duties of the AEC were assigned to the Nuclear Regulatory Commission (NRC). In 1988, 42 U.S.C. Sec. 2210(n)(2) was amended to provide that the federal courts shall have original jurisdiction over public liability claims.

Defendants contend the Atomic Energy Act and the Price-Anderson Act provide a comprehensive federal regulatory program for the licensing and operation of nuclear-related facilities and claims arising from their activities.

## FEDERAL PREEMPTION

The Court must now determine whether or not the federal government's regulation of industries associated with the use, production and control of nuclear energy are so pervasive as to preclude this court from exercising jurisdiction. Federal preemption occurs in a few specific ways. First, Congress has the authority to preempt within congressional limits the authority of states by express terms. Second, where there is no explicit preemptive language, the intention of Congress may be found where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the state to supplement it. Third, preemption is found where state laws conflict with federal laws or where the state laws stand as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Pacific Gas & Electric Company v. State Energy Resources Conservation & Development*, 461 U.S. 190, 175 L.Ed 2d 752, 103 S. Ct. 1713 (1983).

As discussed above, a challenge to tribal court jurisdiction based on a federal statute that does not include Indian tribes requires another step in the analysis. The *Pela* court held that where a federal statute does not include Indian tribes but confers concurrent jurisdiction upon the federal and state courts, the tribal courts may exercise jurisdiction over the claim. Since this court has already found that the Price-Anderson Act does not specifically include Indian tribes and will not expand the language of "states" as used in the Price-Anderson Act, an analysis on whether the Act provides for federal and state concurrent jurisdiction is necessary. The third method of finding preemption will be discussed following the discussion of concurrent jurisdiction.

# CONCURRENT JURISDICTION

The Price-Anderson Act is not about exclusivity; rather it confers concurrent jurisdiction to both the states and federal courts where indeed there is a public liability action. The Court in *In Re TMI Consol. II, supra,* acknowledged that the retroactivity features of the Amendments Act promote "equitable and uniform treatment of victims,"; "the orderly distribution of funds"; and, "avoidance of similar issues in multiple jurisdictions that may occur in the absence of consideration." The features reveal congressional concern with multiple claims and the cost of dealing with the duplicative issues in several state courts. The foregoing features would not be factors where only one person is affected by the nuclear incident or where all claims are filed in a single state court. Thus, it is possible and sometimes more efficient for a state to resolve public liability actions. *Id.* at 861.

An example of how and when resolution of a public liability claim in a state court is more efficient than removing the claim to federal court occurred in *Akins v. Rodriquez,* 15 F.3d 883 (9th Cir. 1994). Plaintiff filed a claim in California state court against American Nuclear Insurers (ANI) and current and former employees of nuclear power plant's owner and operator. Said claim was based upon contamination of stream by discharge of radioactive material. ANI provided insurance to nuclear power plant licensed by the Nuclear Regulatory Commission as required by the Price Anderson Act. ANI removed the case to federal court. The federal district court issued a stay and remanded the case to the state court. ANI petitioned the Ninth Circuit Court of Appeals for a writ of mandamus challenging the remand order. The Ninth Circuit Court first considered whether abstention was proper under *Colorado River Water Conversation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). This case set out factors which should be considered by a federal district court in determining whether to defer to a concurrent state proceeding. The Ninth Circuit Court held that the district court did not abuse its discretion in ordering the remand because the decision was based on the concern of the dangers of piecemeal litigation, since litigation of *Akins I* was pending in state court to determine the issue of whether certain injuries from radiation were sufficient to support a cause of action under California tort law. Moreover, *Akins I* had been pending in state court for four years and there had been little progress in the federal litigation and the forum in Sacramento was equally convenient. Importantly, the court found that state law questions predominate in the federal action and state substantive law is applied in public liability actions, unless such law is inconsistent with the Price-Anderson Act. *Id.* at 887.

Nor does the Price-Anderson Act preclude the use of state remedies. In *Silkwood v. Kerr-Mcgee Corporation,* 78 L.Ed.2d 443, 104 S. Ct. 615 (1984), the Supreme Court held that state-authorized award of punitive damages arising out of escape of plutonium from a nuclear facility was not preempted by federal law. The Court looked at the legislative history, noting that the 1966 amendments

made it clear that state remedies were still available, notwithstanding AEC's regulating and licensing authority. A Joint Committee Report regarding the relationship between the Act and existing state tort law was cited as follows: "Since the rights of third parties who are injured are established by state law, there is no interference with the state law until there is likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity. At that point the federal interference is limited to the prohibition of making payments through the state courts and to pro rating the proceeds available." *Id.* at 456, citing *S. Rep. No 296. 85th Cong, 1st Sess. 9* (1957), *U.S. Code Cong and Admin News* (1957), pgs. 1803, 1810.

In determining that punitive damages have always been part of traditional tort law that has not been specifically supplanted by the Act, the Court stated, "It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal means." *Id.* at 454. In conclusion, the Price-Anderson Act has not totally exempted states from hearing public liability claims; thus, there is no absolute exclusive federal court jurisdiction under the PAA.

The Navajo tribal courts, similarly, are not precluded from hearing torts allegedly arising from a defendant's conduct within the territorial jurisdiction of the Navajo Nation.

## STATE / TRIBAL LAW DOES NOT CONFLICT WITH FEDERAL LAW

The third way preemption may occur is where state laws conflict with federal laws or where state laws stand as an obstacle to the accomplishment of congressional objectives. In *Pacific Gas & Electric Co., supra,* the Supreme Court held that a California statute imposing a moratorium on the certification of new nuclear plants until the state energy commission finds that there exists a demonstrated technology or means for the disposal of high level nuclear was not preempted by the Atomic Energy Act. Petitioner argued that the federal government was the sole regulator of all matters and the statute was preempted because it attempted to regulate the nuclear industry. The Court accepted the state's avowed economic, rather than safety, purpose as the rationale for enacting the statute and held that the statute lied outside the federally occupied field of nuclear safety regulation. The Court reasoned that in the Atomic Energy Act, along with all of its revisions, Congress has preserved the dual regulation of nuclear-powered electricity generation; the Federal Government maintains complete control of the safety and "nuclear" aspects of energy generation. The states exercise their traditional authority over economic questions such as the need for additional generating capacity, the type of generating facilities to be licensed, land use and rate-making.

In the case at bar, the Petitioners, likewise, are not attempting to regulate the

nuclear industry which is preempted by the Price-Anderson Act. Petitioners seek to redress harm they allegedly suffered as a result of the Shiprock Mill operations. Moreover, there is an assumption of jurisdiction by the Navajo Tribal Court to adjudicate a common law tort that does not conflict with the federal government's goal of regulating nuclear safety concerns.

## FEDERAL REGULATORY SCHEME

Defendants contend that in enacting the Atomic Energy Act and the Price-Anderson Act, Congress declared that the possession, use and production of atomic energy and nuclear materials were vital to the United States and must be subject to federal control and regulation. Also, in its efforts to encourage private entities to participate in the development of the United States' nuclear resources, the federal government created a comprehensive system for resolving nuclear tort claims.

This Court does not disagree with these statements. The legislative history of the Acts indeed set forth the intent of Congress. However, Defendants' arguments are misdirected. Petitioners' claims do not attempt to regulate the nuclear industry. In fact, to do so would be a physical impossibility because the Shiprock Mill has not been operating for over 20 years. Instead, Plaintiffs are asking this Court to adjudicate a traditional common law tort that has not been precluded by the Price-Anderson Act. As discussed previously, the Price-Anderson Act did not preclude the use of state remedies nor did it preclude the use of Navajo Nation remedies.

Moreover, Defendants' argument that this Court's jurisdiction is foreclosed by the Treaty of 1850 borders on an outdated and patronizing attitude toward Indian tribes. Defendants argue that since the Navajo Nation depends on the United States for its protection and defense it must defer to a comprehensive federal scheme created for the resolution of nuclear torts. Apparently, Defendants' rationale is that the Atomic Energy Act and the Price-Anderson Act were designed to protect the common defense and security of all United States citizens and exercise of tribal jurisdiction is a violation of the 1850 Treaty since the Navajo Nation agreed that the responsibility of its defense against its aggressors would rest in the United States. This Court is confused. Are Defendants asserting that exercise of jurisdiction over an alleged tort resulting from a uranium mill within the territorial jurisdiction of the Navajo Nation is an act of war?

Further, Defendants' argument implies that since the Navajo Nation entered into a treaty with the United States for protection from foreign aggressors, the Navajo people must sacrifice their lives for the development of nuclear energy. Indeed, Congress declared that the development of nuclear energy is a paramount concern in enacting the Acts, but it was not to be developed at all costs, certainly not at all human costs. Defendants also argue that nuclear torts are new and have no part in Navajo traditions. Harm resulting from new technology does not automatically foreclose a court from providing a forum for Navajos who may

have been harmed by new technology. The Navajo Nation is constantly bombarded by new technology and the Navajo courts have been able to deal with them as they arise. The fact that nuclear technology is not a Navajo tradition does not preclude the Navajo courts from administering justice. In sum, the Atomic Energy Act and the Price-Anderson Act do not preempt this Court from adjudicating torts arising within the territorial jurisdiction of the Navajo Nation.

## NON-PUBLIC LIABILITY ACTION

Even if Defendants' argument that the Price-Anderson Act applied, was accepted, this Court would not be precluded from hearing this claim because the factual prerequisite of "public liability" action has not been shown to the court. The factual prerequisite of the statute requires first that "public liability" be found before it is covered by the Price-Anderson Amendments umbrella. For a private company to be eligible for a public liability claim, the company must have an agreement with the federal government to handle nuclear material. 42 U.S.C. Sec. 2021(C)4. The agreement includes licensing; guarantee of insurance; and, indemnification by the federal government. Those companies that did not obtain a license or those that did not obtain federal indemnification do not fall within the "public liability" scope and the Act is not applicable. The NRC was given discretion on whether to require licensed plants to maintain financial protection. Hence, government indemnification is available only to those who are indemnified. Section 2210(e).

Accordingly, at the outset, a federal definitional matter must be resolved where an action asserts liability arising out of a nuclear incident. To wit: is this a public liability action? If the answer is yes, the Price-Anderson Act is applicable and no action for injuries caused by the release of radiation from a federally licensed nuclear power plant separate from the federal public liability action created by the 1988 amendments is allowed.

It is this Court's opinion that Defendants failed to show that the Plaintiffs have a public liability claim subject to removal that is potentially compensable under the Price-Anderson Act. Defendants have not shown the Court that they were licensed with the federal government, nor have they shown that they were covered by federal indemnity insurance. Moreover, public liability claims that are compensable pursuant to the Price-Anderson Act involve the federal government as a named defendant so that the federal government may indemnify the defendants and channel liability in accordance with the scheme. Thus far in this case, neither the NRC nor the Secretary of Energy has been named or brought in as defendant. This Court concludes that this claim does not fall within the scope of a public liability action and the Price-Anderson Act is not applicable here. Since the Price-Anderson Act gives federal courts original jurisdiction over public liability actions, state courts and tribal courts are not precluded from hearing "non-public liability" claims.

## COMITY

In *Pela*, the Navajo Nation Supreme Court held that the doctrine of comity applies only in actions properly pending in "the courts of another sovereign." Comity is sparingly applied out of respect and deference to tribal sovereignty. For the reasons stated above, this Court is not convinced that the Price-Anderson Act bars the Navajo tribal court from hearing this action. Tribal court jurisdiction is an important and integral part of the tribe's sovereign status. Further, to allow the federal courts to determine substantive Navajo common law would seriously undermine Navajo tribal sovereignty. In conclusion, to extend courtesy based on comity in this case would not be in the best interest of the Navajo Tribe.

## CONCLUSION

Congress enacted the Price-Anderson Act to create a body of federal substantive law regulating nuclear activities to ensure uniformity in enforcement of nuclear safety and to provide compensation over public liability claims. Exercise of tribal court jurisdiction does not conflict with, nor interfere with, that Congressional intent. As in *Pela*, those areas of state and federal public liability claims are exclusive to the federal courts. Thus, Navajo tribal court jurisdiction is not precluded by the Price-Anderson Act.

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss this case is DENIED.